WILLIAM G. HUME *et al. v.* COMMERCIAL BANK *et al.*

BANKS. *Directors. Directors who do not accept and fail to discharge the duties of the office not liable to creditors..* The owners of the charter and stock of a State bank, men of good character and having the confidence of the community, published in the newspapers of the city in which the bank was located, a business card of the bank, with their own names as officers, and with the name of one of themselves as a director, and the names of four other persons as directors, who were not stockholders, who had never been notified that they were elected directors, nor accepted the office, nor acted as such, and continued the publication for over four years with the knowledge of such persons, but without their active participation. *Held,* the bank having failed, that the creditors had no right of action, either through or independent of the corporation, against such persons for failing to discharge the duties of directors, it not appearing that they, or either of them, had done or said anything tending to lead any of the creditors to believe that they were directors.

FROM KNOX.

Appeal from the Chancery Court at Knoxville. W. B. STALEY, Ch.

CORNICK & CORNICK for complainant.

JAMES COMFORT for Trustee.

INGERSOLL & COCKE for Tillman, Administrator.

GEORGE ANDREWS and W. M. BAXTER for Ross and Boynton.

GEORGE BROWN and GEORGE WHITE for Henegar.

COOPER, J., delivered the opinion of the court.

By the act of 1870, ch. 96, Hugh L. McClung, R. M. McClung, John Williams and R. R. Swepson, were created a body politic and corporate under the name and style of the Commercial Bank of Knoxville, subject to all the restrictions and penalties, and entitled to all the benefits and privileges of the charter creating the Knoxville Bank, passed March 25, 1866. The Knoxville Bank charter provides that the capital stock shall not exceed $100,000, and that the corporation shall be subject to such general laws as the Legislature may pass in reference to banks and other similar institutions. By the third section of the act of 1870, ch. 96, it is provided: "That the individual property of the several stockholders shall be responsible for all the debts, liabilities and deposits of said bank."

About the 20th of November, 1872, at the instance of R. M. McClung, and in a blank book furnished by him, entries were made by a lawyer to the effect that the charter granted by the act of 1870, was accepted by the corporators named, and that John Williams and R. R. Swepson had transferred their rights under it to R. M. McClung, R. R. Bearden and Sam House, and opening the books for subscription to the capital stock of the bank. Thereupon, R. M. McClung, Bearden and House each subscribed for the stock to the amount of either $30,000 or $31,666.66. At the same time the names of James R. Cocke, H. B. Henegar, D. T. Boynton, G. W. Ross, and, perhaps, Hugh

L. McClung, or W. Easley, Jr., or both, were also
signed to the stock list for shares to the amount of
either $1,000 or $2,000 each. It is agreed by all the
witnesses who testify that they were present on the
occasion, that H. B. Henegar, who lived about seventy
miles from Knoxville, was not there, and that his name
was signed by R. M. McClung. The evidence tends
also to show that neither Hugh L. McClung nor W.
Easley, Jr., was present. They are not parties to this
litigation. Whether the names of Cocke, Boynton and
Ross were signed by themselves, or by other persons,
is one of the contested questions of fact. The blank
book containing the subscription list was kept in the
vault of the bank, and was produced and submitted
to the creditors at a meeting held by them after the
failure of the bank as hereinafter mentioned. It is
not traced further, and when search was subsequently
made for it could not be found. Curiously enough,
no creditor who then saw it, most of whom were prob-
ably citizens of Knoxville, is called upon to testify as
to the hand-writing of the subscribers.

Immediately after the subscription of stock, the bank
commenced business with R. M. McClung as president,
R. R. Bearden as vice-president, and Sam House as
cashier. An advertisement of the fact, giving the names
of these persons as the officers, and stating the board
of directors to be James R. Cocke, H. B. Henegar,
D. T. Boynton, G. W. Ross and R. R. Bearden, was
published in the daily and weekly editions of two
Knoxville newspapers, and continued to be published
in the same form until after April 4, 1877. On that

Hume *v.* Bank.

day, the bank suspended business, and made to Hugh
L. McClung, as trustee, a general assignment, for the
benefit of creditors, "of all its property, real and per-
sonal and mixed, and all its assets and effects of
every kind and description." McClung declined to ac-
cept the trust, and James Comfort was appointed trus-
tee in his place.

R. M. McClung, Bearden and House understood
themselves to be sole owners of the bank, and of the
stock subscribed, and so say in their testimony. They
had agreed among themselves in advance to share
equally the profits and losses, and to pay interest to
each other upon any money paid in by either on the
capital stock. In fact, only $8,141.05 were paid in
by Bearden, and the amount was put on the books of
the bank to his individual credit. No call of stock
was ever made, nor stock account kept. No meeting
of stockholders, except at the organization of the bank,
and no meeting of directors at any time, was ever
held. No notice of the subscription of stock to the
persons not present when the names were signed, nor
of the election of directors seems to have been given.
As between them and the bank as a corporation, neither
Cocke, Henegar, Boynton or Ross ever claimed to be,
or was recognized by the officers or stockholders, as
directors in the actual conduct of the business. The
last three were depositors of the bank, Henegar closing
his account January 1, 1876, Boynton January 1, 1877,
and Ross continuing until the suspension. Cocke died
in July, 1874, and Lewis Tillman qualified as adminis-
trator of his estate on the 8th of the succeeding month.

He enquired at the bank and was informed by Mc-Clung that his intestate had no interest therein.

From the commencement of the business of the bank, McClung, Bearden and House seem to have treated the deposits and assets of the bank, as well as the franchises of the charter, as their individual property. Each of them drew from the bank whatever money he thought proper, making a memorandum or ticket of the amount, which was theoretically treated as on call and carried into the books of the bank as cash on hand. On September 26, 1874, a trial balance on this basis was taken, and showed an apparent profit of over $11,000, and the partners drew out in all $10,064.65. But if the items included in the cash account, which ought to have been charged to the individual accounts of the parties, had been properly posted, the true statement would have shown a loss of several thousand dollars. The capital paid in had been exhausted, and there was an actual deficit as early as January 1, 1874. On September 26, of that year House sold his stock and interest in the bank to McClung and Bearden, and severed his connection entirely by resigning his office of cashier. After that date, McClung and Bearden continued to draw out money for their own purposes, and to allow firms with which they were severally connected to become over-checkers, until at the time of the suspension there was a deficit, thus occasioned, of over $80,000.

On July 3, 1877, the original bill in this cause was filed by W. G. Hume and others, as creditors of the Commercial Bank, as well for all other credi-

tors as for themselves, against the Commercial Bank, and McClung and Bearden as officers of the corporation and individually, James Goodrich, cashier, and James Comfort, trustee, H. B. Henegar, D. T. Boynton, G. W. Ross and Lewis Tillman, administrator of James R. Cocke, deceased. The object of the bill is to hold the last four defendants liable for "all the debts, liabilities and deposits of the bank," under the provision of the third section of the charter; and to hold them liable for all sums of money misapplied or misappropriated by the officers of the bank, because they had "negligently omitted and wilfully neglected to discharge the duties incumbent upon them as directors."

On September 27, 1877, James Comfort, as trustee, answered the original bill, and filed his answer as a cross-bill against the other parties defendant to that bill, the parties complainant thereto, and all the creditors of the bank, for an adjustment of disputed debts, the settlement of his trust under the orders of the court, and to hold Henegar, Boynton, Ross and Tillman, administrator, liable as stockholders and directors. This bill sets out the dealings of McClung and Bearden with the funds of the bank, and their misappropriation of those funds to their own use, and avers that the facts appear on the books, and that an examination at any time would have shown the truth. The bill further alleges that Henegar, Boynton, Ross and James R. Cocke were, during all the time, published to the world as directors of the bank with their knowledge, and by their consent; and that the

knowledge on the part of the public that they sustained this important relation to the bank gave it credit, and induced the depositors, who are now the creditors, to deposit their funds in the belief that the supervision of these directors rendered it a safe and reliable institution; but that they wholly failed to discharge any of their duties as directors, and omitted and neglected to exercise any supervision or control over the bank officers, and by this gross and wilfull negligence permitted such unlawful appropriation of funds.

All of the defendants, who are thus sought to be charged, deny in their answers that they were either stockholders or directors of the bank, or had anything to do with it, as a matter of fact, in either capacity. The evidence is entirely conlusive that not one of them ever claimed to be, or received any benefit as a stockholder, or ever, in any way, whatever, acted as a director. The bank was, as we have seen, exclusively claimed, owned and managed by McClung, Bearden and House. These persons all say in effect what Bearden says in so many words, that it was understood that all the stock, no matter by whom subscribed, was owned by them. They were, in reality, stockholders, officers and directors. Under these circumstances the presumption, where there was a conflict of testimony on the point, would be that they had made the subscription themselves.

Before stating the testimony on this subject, it may be well to premise that McClung, from 1865 to the organization of the Commercial Bank, had been the

cashier of the First National Bank of Knoxville, which had gone into liquidatiðn. He was anxious to start a new National bank, and for this purpose had consulted the parties sought to be charged in this case, and especially Boynton and Ross, one of, whom was the pension agent and the other a disbursing officer of the United States at Knoxville. These parties had agreed to take stock in such a bank to be managed by him. It was found, however, that the limit of currency then allowed by act of congress had been reached, and a National bank could not be organized. McClung, therefore, determined, in conjunction with Bearden and House, to start a bank under a State charter, but with the intention, if, as he thought probable, congress should at its approaching session increase the currency, to turn it into a National bank. In the event of such a change, it was understood that the defendants would become stockholders.

In this attitude of the parties, the Commercial Bank was organized. The lawyer who drafted the entries in the subscription book says that it was understood that McClung, Bearden and House were to own the bank, but he was not present when it was organized. McClung says that he, Bearden and House, and perhaps Cocke, were present. He, Bearden and House each subscribed to the capital stock $31,666.66. He then subscribed the names of Hugh L. McClung, Henegar and Ross for $1,000 each. He thinks Bearden subscribed the names of Boynton and Cocke for a like amount. He cannot say that he had permission or authority from Henegar or Ross to make the subscrip-

tion, and does not know that he ever had any con-
versation with either of them about their being stock-
holders or directors.　Bearden, in his examination in
chief, says that McClung, House and himself were pres-
ent, and he thinks the lawyer who drafted the entries.
He says that the whole stock of $100,000 was sub-
scribed by McClung, House and himself, McClung en-
tering $1,000 each to Ross, Boynton and Henegar.
"It was, however," he adds, "understood that all the
stock was owned by McClung, House and myself." On
cross-examination, he says that he · is not positive
whether Cocke subscribed in person, or whether the
subscription was made by some one for him.　His
recollection is that Cocke knew of the subscription.
"But," he repeats, "all the stock I regarded as belong-
ing to McClung, House and myself." He says he had
no authority to sign for any one except himself, and
does not remember that he did.　He is asked by
complainant's counsel: "Did not Boynton, Ross, Cocke
and Henegar know that stock had been subscribed
in their names, and agree that it might remain in
their names, and were they not fully advised that they
were to be advertised as directors before the adver-
tisement appeared?"　His answer is: "Not to my
knowledge, unless as to Mr. Cocke, which has been
explained.　I never had any conversation with Ross,
Henegar or Boynton on the subject until the bank sus-
pended. . I never consulted with either of the parties
in regard to the use of their names as stockholders or
directors, nor in regard to publishing their names as
such." This witness also says that McClung told him

that Boynton, Henegar and Ross expected that the bank would be turned into a National bank, and if this was done on the basis of $50,000 capital they would each take $5,000 in stock, and would prefer McClung for president. The bank was organized under a State charter, but the purpose was to make it a National bank. Finding that it required a capital of $100,000 to make it a National bank, it was continued under the State charter.

House testifies first that McClung, Bearden, Cocke, he and others organized the bank. Further on, in answer to another interrogatory, he says that McClung, Bearden, Cocke, Webb (the lawyer who drafted the entries), and he were present at the organization, and, he adds, "I think D. T. Boynton and George W. Ross." He says that McClung, Bearden and he each subscribed $30,000 to the capital stock, and Ross, Boynton, Henegar and Cocke each $2,000. As to the other $2,000 necessary to make up the $100,000, he is not positive whether it was in the name of Hugh L. McClung or W. Easley, Jr., or both, but thinks both names were on the book. He elsewhere states that Henegar's name was signed by McClung, that Cocke signed for himself, and he or Bearden subscribed for Easley, if he was a stockholder. He does not recollect that Hugh L. McClung was present. Thinks Boynton and Ross subscribed themselves, but may be mistaken as to their being present. He explains that he was still in the employ of the First National Bank as bookkeeper, that he was called in when they were ready to organize, that he was sent by McClung to Boyn-

ton and Ross and had the conversations with them testified to, and got away as soon as possible as he had no time to spare.   He was, it seems, sent by McClung to explain to Boynton and Ross the plan agreed upon for organizing the bank, namely, that Bearden should be president. McClung vice-president, and he, House, cashier.   Boynton and Ross objected to the making Bearden president, preferring McClung.   The plan was changed accordingly, and upon his returning and notifying Boynton and Ross, they expressed themselves satisfied.   He is asked:  "Did you ever see the names of Boynton and Ross on the stock book?   If so, in whose handwriting were they?"  His reply is:  "I recollect seeing a list of stock on the books used at the organization, but do not recollect the handwriting."

Hugh L. McClung says he does not think he was present when the bank was organized.

Boynton, Ross and Henegar all testify that they were not present at the organization of the Commercial Bank; never subscribed, or authorized any person to subscribe stock therein, and were never informed of the subscription or that any person claimed that they were stockholders until the suspension of the bank.   Boynton and Ross both speak of having joined McClung in an application for a charter of a National bank which failed.   And Ross adds that McClung told him that he, Bearden and House were going into a new bank under a State charter until congress met, when he thought the volume of currency would be increased, and if it was he would renew his application.

In this state of the evidence it is clear, and is

frankly conceded by the trustee, that there is no sufficient proof that Henegar either authorized the subscription of stock made in his name by McClung, or afterwards ratified it. He cannot, therefore, be held liable as an actual stockholder.

McClung admits that he signed the names of Hugh L. McClung, Henegar and Ross to the stock list, and says that Bearden signed the names of Boynton and Cocke. Bearden first testifies that the whole stock was subscribed by McClung, House and himself, McClung entering $1,000 each for Ross, Boynton and Henegar. He is not positive whether Cocke subscribed in person, or whether the subscription was made by some one for him. His recollection is that Cocke knew of the subscription in his name. House testifies that Cocke was present at the organization, and thinks that Boynton and Ross were also, although, he concedes, he may be mistaken in this.

The evidence illustrates the uncertainty of human memory in the matter of details, important and unimportant, after the lapse of years. Bearden and House both think that the lawyer, who drafted the preliminary entries in the blank book, was present at the organization of the bank, while McClung and the lawyer himself testify that he was not. House, although conceding that he may be mistaken, thinks that Boynton and Ross were present on that occasion, while McClung and Bearden concur in testifying to the contrary. McClung swears that Bearden signed the names of Boynton and Cocke, while Bearden swears that McClung entered the subscription to the name of Boyn-

ton as well as of Henegar and Ross, and House thinks that Bearden or Cocke signed the name of Easley, if, he adds, Easley was a stockholder. McClung and Bearden limit the subscription of the outside parties to $1,000, while House raises it to $2,000. House says Cocke signed in person, while Bearden is in doubt whether the subscription was not made by some one else, and McClung is positive that Cocke's name was signed by Bearden. No explanation is offered by either of these witnesses who think the subscription was made in person, of the curious fact, if fact it be, that parties should so subscribe for the exclusive benefit of others, all three witnesses agreeing that they were to be sole owners of stock and bank.

Only one witness, outside of the officers and the parties, is examined whose testimony bears on this branch of the case, and he only says that in the financial panic of 1873, Ross assured him that there was no danger, and that the bank would resume in a few days; and that on one occasion, probably before that event, Cocke, while speaking highly of the bank, and naming the directors, said, according to the witness' best recollection, that he was a stockholder; but the witness adds: "I do not state it positively."

Under these circumstances, the oaths of Boynton and Ross are sufficient to turn the hesitating scales so far as they are concerned, and the result thus produced may equally weigh in favor of Cocke, who cannot be a witness in his own behalf. The version of the transaction given by McClung is consistent with this view, and most in accord with the conduct of all par-

ties. It is almost certain that McClung, feeling assured that these friends of his would join in the establishment of a National bank, and intending to turn his State bank into that character of institution, persuaded himself and his colleagues that they might use their names as they did. And, at any rate, the complainants have failed to make out by satisfactory proof such a case as is required where parties are to be charged personally as stockholders with the liabilities of an insolvent corporation, with which it is clear they had in fact nothing whatever to do. We are of opinion that Boynton, Ross and Cocke were not stockholders of the Commercial Bank.

It is argued, however, that although not actually stockholders, all of these parties may be held liable as such upon the principle that being directors and having access to the books, they are chargeable with knowledge of, and concluded by what appeard on the stock book. For this principle counsel cite *Moses* v. *Ocoee Bank*, 1 Lea, 398, 407, and *United Society of Shakers* v. *Underwood*, 9 Bush, 617. But both of these cases were cases in which the persons sought to be charged were stockholders in fact, and actual directors. In the case before us, the persons sought to be charged were never stockholders, and only nominal directors. They had never undertaken to perform the duties of the board of directors, were never in control of the business of the bank, nor allowed access to its books. A director in law and fact, who actually assumes the duties of an office, must be held to its responsibilities, and will be bound by the necessary presumptions raised by the

facts. The same strict rules are clearly not applicable to nominal directors, who have never accepted the office although held out as such. Nor are the defendants estopped to deny that they were stockholders by the fact of having become directors, or held themselves out as such. For it is not necessary that a director should be a stockholder unless expressly required by the charter or by statute: *In re British etc., Association*, 5 Ch. Div., 306; *State* v. *McDaniel*, 22 Ohio St., 354. No such requirement is contained in the charter of the bank under consideration. That instrument does provide that the corporation shall be subject to such general laws as the Legislature may pass in reference to banks and other similar institutions. And the general banking law directs that not more than two-thirds of any bank directory shall be stockholders in the bank for which they act as directors: Act of 1860, ch. 27, sec. 15; Rev. Code, sec. 1829*b*, sub-sec 15.

The principal defendants were unquestionably held out to the public as directors of the Commercial Bank by advertisement in the public newspapers at Knoxville, continuously published from the organization of the bank until its suspension. It is certain also that these defendants saw the advertisement, and took no steps whatever to have it withdrawn. No doubt, too, the belief that they were directors had a tendency to strengthen the public confidence in the bank which already existed by reason of the business character of the officers of the bank. On the other hand, as we have seen, no formal notice was ever given to them

of their election, nor any acceptance by them of the office, nor any assumption of its duties, nor any request by the owners and stockholders for them to perform the duties.   They were never guilty of any misfeasance in office, but simply of neglect to perform. The bills of the creditors and the trustees both seek to hold them liable for negligence only.

We may premise the consideration of the question thus raised by saying that as James R. Cocke was not a stockholder, his liability as a director necessarily terminated at his death, and only those creditors whose claims originated in his lifetime would have any right of action: *Ogden* v. *Rollo*, 13 Abb. Pr., 300.   The administrator would not be liable for neglect of the duties of an office which he neither assumed, nor was held out as assuming.   If, moreover, the liability created in the lifetime of the intestate was to the corporation, and the creditors could only work out their equity by subrogation, the estate would be protected by the statute of limitations of two years and six months.   And the same statute would bar all demands of citizens of this State in any event.

By the provisions of the Code in relation to private corporations, intentional fraud in failing to comply substantially with the articles of incorporation, or in deceiving the public or individuals in relation to their liabilities, subjects all officers, stockholders or directors knowingly participating therein to the penalalties of a misdemeanor, and, moreover, to damages at the suit of any person injured: Code, sec. 1488.   And by the general banking law it is provided: "If any

director or directors of any of the banks of this State shall be guilty of any fraud or wilfull mismanagement of the affairs of such bank by which any loss shall be occasioned to creditors, such director or directors, upon legal ascertainment of the fact, shall be individually liable for such loss": Act of 1860, ch. 27, sec. 26; Rev. Code, sec 1829*b*, sub-sec. 24. The cases provided for by these sections are cases of intentional fraud and wilfull mismanagement. The facts disclosed by the record before us do not implicate the principal defendants, even if they be treated as actual directors, in any such positive misfeasance. All [that they can, in any event, be charged with is neglect to perform the duties of directors. The liability, if any, for negligence, is not statutory, but depends upon the general principles of law regulating the relation of the parties.

The directors of a corporation are its principal agents, and occupy a fiduciary relation towards the corporation and the stockholders: *Shea* v. *Mabry*, 1 Lea, 319, 342; *Lane* v. *Bank of West Tennessee*, 9 Heis., 419; *Vance* v. *Phœnix Ins. Co.*, 4 Lea, 385; *Parker* v. *McKenna*, L. R., 10 Ch., 96; *Jackson* v. *Ludeling*, 21 Wall., 616. As agents they are primarily liable to the corporation both for non-feasance and mis-feasance, but they may, in equity, be proceeded against by stockholders or creditors in proper cases, who will be subrogated to the rights of the corporation: *Shea* v. *Knoxville & Ky. R. R. Co.*, 6 Baxt., 277; *Moses* v. *Ocoee Bank*, 1 Lea, 398; Ang. & A. on Corp., sec. 312. And such liability of directors is assets in the hands of the bank, and passes to a gen-

Hume v. Bank.

eral assignee for the benefit of creditors: Morse on Bank, 135. These principles are plain enough, and easy of application in the case of real directors who have accepted and assumed the duties of office. The difficulty of applying them in the present instance grows out of the peculiar facts shown, presenting an altogether novel case, which has, perhaps, never passed into judgment.

In the first place, it is difficult to see how the corporation or the stockholders could maintain an action against the defendants on the facts of this case. The charter and the stock of the bank were exclusively owned by the persons whose duty it was to pay in the capital stock, and who misappropriated the funds. These owners and stockholders never called upon the defendants, or permitted them to discharge the duties of a board of directors. Clearly, neither they nor the corporation for them would have any right of recovery against the nominal directors. And the creditor, if he take anything by subrogation, must do so on his own merits or equities. And to enable the creditors to sue the defendants directly they must have some independent right of action either legal or equitable. Such an independent right is, as we have seen, created by statute where the director has been guilty of intentional fraud or wilfull mismanagement. And we are not prepared to say that it would not exist without the aid of the statute in such cases, for they would thus become participators in a wrong and liable to the person aggrieved.: *Salmon* v. *Richardson*, 30 Conn., 260. But the testimony entirely exonerates the pres-

ent defendants from all participation in, and knowledge or even suspicion of the acts complained of. They were themselves depositors in the bank, with the same unbounded confidence in the institution and its officers as the creditor complainants. The proof shows that the officers of the bank, especially the president, had the confidence of the entire community. The defendants, so far as appears, were never called upon by any existing creditor for information touching the bank or its officers. They are as free from blame as one of the creditors except in allowing their names to continue to be published as directors, when they were not directors. The litigation is, consequently, narrowed down to the point whether the acquiescence of the defendants in the publication of their names as directors confers upon the creditors of the bank a right of action against the defendants, either to be worked out through the corporation or independent of that of the corporation, for failing to discharge the duties of an office which was never actually accepted or assumed.

This point seems to be one of first impression, for the able counsel of the complainants have found no authority directly sustaining their contention. They rely in argument upon the analogy of the liability of a third person who holds himself out as the member of a partnership, and upon the general doctrine of estoppel. And inasmuch as the liability of a person who holds himself out as a partner rests upon the doctrine of estoppel, we may consider the whole argument under the head of estoppel.

The case of a nominal partner is not, however,

strictly analogous to that of a nominal director. A partner is directly liable to every creditor of the firm, and the liability of a nominal partner is equally direct to those creditors of the firm to whom he makes himself liable. A director of a corporation, as we have seen, is the agent of the corporation, and ordinarily only liable directly to the corporation. If he becomes liable directly to a creditor, it must be by statute, or by some conduct which creates a privity of contract between them, or which results in a tortious injury to the creditor for which an action *ex delicto* will lie. And even in the case of a person who holds himself out to the world as a partner, the extent of liability seems to depend upon the mode of holding forth. If it be by his authority, assent or connivance, the presumption is absolute that he has so held himself out to every creditor or customer. If the holding out be by negligence merely, the liability would only be to such creditors as have been actually misled: Pars. on Part., 119. And even a partner would not be liable directly to a creditor of the firm for a loss of partnership assets occasioned by mere negligence in the conduct of the firm business, nor, *a fortiori*, would a nominal partner who simply neglects to attend to the business at all. An agent is alone responsible to his principal for a neglect of duty: *Calvin* v. *Holbrook*, 2 New York, 126.

The law of estoppel is a branch of the law of evidence, for it is the law by which evidence of the truth is excluded. Equity does not favor estoppels against the truth, and it has been broadly said, per-

haps too broadly, that where the element of fraud is wanting there is no estoppel. It is a growing branch of the law, in which decided cases are of less value than usual, for the reason that every cause must depend upon its own peculiar facts and circumstances. As a general rule there must be word or conduct by one party, action based thereon by the other party, and injury to the latter to preclude the admission of evidence in conflict with the word or conduct.

It is not pretended that the record shows that the defendants have ever said anything in regard to the bank, or their relation to it as directors, upon which the creditors have acted. The evidence does not show that any one of them authorized the publication of his name as a director, or so acted by word or deed as to induce any creditor to act on the assumption that he was a director. The names of the defendants were merely published to the world in the newspapers as directors by the owners and officers of the bank, and the defendants took no notice of the publication. It has been held at *nisi prius* in England, by Wilde, C. J., that persons could not be held liable, upon contracts made in their absence, as members of the acting committee of a railroad company, when they had not applied for the appointment, nor acquiesced in it, although they were advertised as such to the public. And the Chief Justice said: "No one is bound to contradict an advertisement:" *Griffin* v. *Beverly*, 2 C. & K., 644. It has been held in this country, that the publication of the name of a person as a trustee of a corporation and the issuance to him of a certifi-

cate of stock, are not sufficient to make him liable for a fraud perpetrated by other trustees and agents of the corporation. The plaintiff swore that he had loaned money to the corporation upon the faith of certain statements made to him by an agent of the corporation, and upon his faith in the names mentioned as directors. "But," said Church, C. J., "he made the loan to the company and not to the directors. He had no right to rely upon their pecuniary responsibility from the fact of being directors. No such responsibility attaches to the office. It is only when a director lends his name and influence to promote a fraud upon the community, or is guilty of some violation of law or other mismanagement, that he is personally liable. When this is shown, he should be held to a strict rule of accountability:" *Arthur* v. *Griswold*, 55 N. Y., 400. Something more than the mere advertisement of their names to the public as directors seems to be required to create liability where the parties are not in fact directors.

Neither the publication in the first instance nor its continuance in the newspapers, in the case before us, was by the authority or express assent of the defendants. It seems to have been acquiesced in by mere negligence. If it be conceded that the publication may have had the effect to increase the public confidence in the bank, it would not follow that any of the existing creditors were thereby induced to trust the bank. One of the few creditors who testifies that his knowledge and information of the "high financial reputation" of the published directors induced him to

place confidence in the "integrity and financial ability of the bank," concedes that he had a high opinion of some of the officers, and that one of them induced him to loan the bank his money on time by the offer of eight per cent. interest. The deposit of this witness was made on February 23, 1877, nearly ·three years after the death of James R. Cocke, one of the directors upon whose "solvency, fidelity and business ability" he relied. Other creditors put their confidence upon the ground that they at all times believed the defendants to be "*"bona fide* stockholders." It is obvious that the publication was only one of many causes of the public confidence.

If in reality the defendants had been elected directors, and upon notice had accepted the office, the publication of the fact to the world with their tacit acquiescence would have been sufficient to charge them with the duties and responsibilities of the office, without reference to the extent of influence which the publication may have had on the creditor seeking to hold them liable. So, if they had acted as directors, whether properly elected or not. But something more seems to be required when the persons sought to be charged were not directors, when through the entire time of publication no word or act on the part of any one of them is proved tending to show that they held themselves out as directors, and when during nearly three years of that period one of the published directors was dead. Another of these directors was a "well to do farmer," living seventy miles from the bank, and only visited Knoxville two or three times

a year. And still another was himself one of the officers of the bank. Obviously, the publication alone constituted but a single element in the confidence of the existing creditors, not one of whom ever consulted a supposed director upon the subject of the bank or his relation to it. The defendants had the same confidence in the bank as the creditors, and no more connection with its business. And it might be said, with some plausibility, that the deposit of the money of the creditors in the bank induced the defendants to acquiesce in the publication of their names as directors, as well as that the publication induced the deposits.

Under these circumstances, it would be too heavy a penalty to visit upon the defendants the result of the misplaced confidence of the public, merely because they negligently allowed the owners of the bank to publish their names as directors, without any overt act or word on their part which could have misled any person to his injury, and without the slightest testimony to connect them with the business of the bank, or the conduct of its officers and owners. If they had confederated with those owners to create a fraudulent corporation, the use of their names as directors, by their consent, to give it credit with the public, would have presented a different question. And so it would have been if any of them had actively misled any of the complainants to his injury. Upon the case made by the record, they are not personally liable to any of the complainants.

This conclusion renders it unnecessary to consider

the extent of a director's liability for mere negligence in the performance of the duties of his office.

The chancellor's decree will be modified in accordance with this opinion, and the bills dismissed so far as they seek to hold the principal defendants liable as stockholders or directors. But these defendants will pay all the costs of the entire litigation between them and complainants in both bills.

FREEMAN, J., delivered the following dissenting opinion:

I concur in the majority opinion, so far as it holds that the defendants in this case cannot be held as stockholders. I do not think the proof sustains the contention of complainants on this question.

But on the point of their being directors, as to all parties dealing with the bank, and responsible, to the full extent that such a relation to the bank involves, I am unable to agree with the conclusion reached.

I am of the opinion that they have effectually estopped themselves, by their conduct, from saying they are not directors, so far as all persons dealing with the bank are concerned.

The advertisement in the Knoxville papers, when the nature and purpose of such advertisement is considered, seems to me conclusive on this question. It was not a mere newspaper paragraph, the work of the editor, giving his information on the subject; but it is more, it is an official notice by the bank of its organization, and its official managers. It notified the

community that a new bank had been started in the city of Knoxville, and the parties named had undertaken to perform the duties appertaining to the positions they were announced as holding. It was an advertisement, as we have said, and not a mere newspaper notice, and therefore was intended to call the attention of the community to the fact stated in it. It was not notice of a private organization for private ends alone, but of a business institution, which by the nature of that business, would depend upon the public confidence for the success of the venture. It was a bank, which was expected to receive the money of all who might trust it—on deposit—and use it in their own business, and be ready to return it when called on. It is a business eminently based on confidence for its success—in fact, impossible to be conducted successfully without this confidence on the part of the public. The main elements of this confidence, as I understand it, are first the capital stock, and second, the skill and integrity with which that capital shall be used by the parties who shall have the direction and control of that capital, as well as the entire conduct of the bank. The directory, the parties who are to manage the institution, is of more importance to the success and safety of the bank, and the security of all parties concerned and dealing with the bank, than even the amount of the capital stock, as mismanagement, and bad use of this, by men not qualified for, or unfaithful to the trust, will soon dissipate the capital stock of any ordinary institution, as experience has abundantly shown.

48—VOL. 9.

This being so, it seems to me, that when parties silently sit by, and permit the community to be notified for years, that they have assumed the management and direction of the affairs of a bank, and that until the bank has been rendered totally insolvent, that they shall not then be permitted, either to deny the fact to be as stated, or escape by any technicality from the responsibility justly attaching to the position so announced to the world as held by them.

How do they escape this responsibility in this case? As I understand it, by a simple disclaimer and denial, when the bank is found to be insolvent, and there is danger imminent in the positions which have been announced for them by the bank. Ought not years of fairly implied assent to the opposite, inviting the public to trust the bank on the faith of their names, as directors, to be of greater force than such disclaimer, made under such circumstances? I am compelled to think, it was then too late to escape responsibility by such a disclaimer.

I cannot see but that these parties must be held as having assented to the advertisement, as emphatically as if they had authorized the advertisement originally to have been made.

It is a fact, and must be held that the use of the names of these parties by the bank, was intended as a means of obtaining public confidence, else why publicly announce through the newspapers the fact at all. If untrue, and unauthorized, such unauthorized use of the names of these parties, was a fraud on them, by the parties so using them.

But are they not parties to this fraud on the public—unintentionally it may be—but still certainly parties by all the rules by which we judge human conduct, and equally responsible to all who, in pursuance of the invitation given by the advertisement, give their confidence to the bank? They allow the bank to notify the public that we will manage the funds entrusted to this institution. You can, therefore, trust the bank—if you have confidence in us—for such a business. Having permitted the bank to use their names as long as the bank could use them successfully, but as soon as responsibility comes—the bank breaks, and danger threatens—it is promptly replied, that advertisement was only a snare and a sham—the bank has caught you by it—but you ought not to have believed the advertisement—it was false from the first —we knew it, but it was not our business to correct it—it was yours to find out how the facts were.

But does this accord with either sound law, or a sound morality. If a man allows, or knows of his name being advertised to the world as a partner in a trading firm, he is held responsible for all its debts, though in fact he never had the slightest interest in the concern. If he knows of such announcement, he is bound to disclaim, and announce the fact that a fraud is being perpetrated on him. If he fail to do this, he is held responsible, because it is a fraud on parties dealing with the firm, if he fails so to disclaim. Why should not the same rule apply to bank directors, as well as partners? I am unable to see any reason for such discrimination.

---
Hume *v.* Bank.
---

There is no technical acceptance of the position of directors, but so far as the public are concerned, they have assumed the position, and have allowed the bank to so notify the community, and that for years. They are bound by acquiescence for this length of time—or else men may allow the use of their names to mislead others, and then escape responsibility by simply announcing the fact, that the fraud was a fraud, and the use of the name for this purpose unauthorized. It seems to me this opens the door wide to as much fraud as parties choose to perpetrate in this way—and then to sanctify it by legal approval.

Suppose these parties had permitted a similar advertisement as this, showing they were stockholders—a list of the stockholders—would any man say, in view of the numerous cases on this question, that these parties would be allowed to escape responsibility as such, by a simple disclaimer. I take it not.

For these reasons, and others that might be given, I am compelled to dissent, from the opinion of the majority in this case.

DEADERICK, C. J., concurs in dissent.